NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Site Evaluation Committee
No. 2018-0468

APPEAL OF NORTHERN PASS TRANSMISSION, LLC & a.
(New Hampshire Site Evaluation Committee)

Argued: May 15, 2019
Opinion Issued: July 19, 2019

McLane Middleton, Professional Association, of Manchester (Wilbur A. Glahn, III, Barry Needleman, and Jeremy T. Walker on the brief, and Mr. Glahn orally), for the petitioners, Northern Pass Transmission, LLC, and Public Service Company of New Hampshire d/b/a Eversource Energy.

Gordon J. MacDonald, attorney general (Christopher G. Aslin, senior assistant attorney general, on the brief and orally), representing the public interest.

City Solicitor's Office, of Concord (Danielle L. Pacik, deputy city solicitor, on the joint brief and orally), for intervenor City of Concord; Mitchell Municipal Group, P.A., of Laconia (Steven M. Whitley on the joint brief), for intervenors Towns of Deerfield, Littleton, New Hampton, and Pembroke; and Drummond Woodsum, of Manchester (C. Christine Fillmore on the joint brief), for

intervenors Towns of Bethlehem, Bristol, Easton, Franconia, Northumberland, Plymouth, Sugar Hill, and Whitefield.

BCM Environmental & Land Law, PLLC, of Concord (Amy Manzelli on the brief and orally), for intervenor Society for the Protection of New Hampshire Forests.

Wadleigh, Starr & Peters, PLLC, of Manchester (Stephen J. Judge, Jeffrey Karlin, and Stephen Zaharias on the brief), for intervenor McKenna's Purchase Unit Owners Association.

Foley & Lardner LLP, of Boston, Massachusetts (Courtney Worcester on the joint brief), for intervenors Ammonoosuc Conservation Trust and Appalachian Mountain Club, and Melissa E. Birchard, of Concord, on the joint brief, for intervenor Conservation Law Foundation.

Bernstein Shur, of Manchester (Andru Volinsky on the memorandum of law), for intervenors Bradley and Daryl Thompson and Jeanne Menard.

Richard J. Samson, Coos County Commissioner, District Three, and Stephen J. Ellis on the joint memorandum of law, for intervenors Towns of Pittsburg, Clarksville, and Stewartstown.

Philip Bilodeau and Joan Bilodeau joined in the brief for the Society for the Protection of New Hampshire Forests.

F. Maureen Quinn joined in the brief for the Society for the Protection of New Hampshire Forests.

Dalton Whitefield Bethlehem Abutters joined in the brief for the Society for the Protection of New Hampshire Forests.

Pemigewasset River Local Advisory Committee joined in the brief for the Society for the Protection of New Hampshire Forests.

Dummer, Stark and Northumberland Abutters joined in the brief for the Society for the Protection of New Hampshire Forests.

Abutting Property Owners, Bethlehem to Plymouth joined in the brief for the Society for the Protection of New Hampshire Forests.

Non-Abutter Property Owners Stark to Bethlehem joined in the joint brief of the City of Concord and multiple towns.

Bethlehem to Plymouth Non-Abutters joined in the brief for the Society for the Protection of New Hampshire Forests.[1]

HANTZ MARCONI, J.  The petitioners, Northern Pass Transmission, LLC and Public Service Company of New Hampshire d/b/a Eversource Energy (PSNH), appeal the decision of the New Hampshire Site Evaluation Committee denying their application for a "Certificate of Site and Facility" (certificate) for the siting, construction, and operation of a high voltage transmission line (HVTL) and associated facilities from Pittsburg to Deerfield (the project).  We affirm.

I.  The Project

The following facts either were found by the Site Evaluation Committee or are drawn from the contents of documents submitted as part of the appellate record.  The petitioners' application proposes to install a 192-mile HVTL to carry 1,090 megawatts of electricity from Canada into New England.  The project's transmission corridor would encompass 3,161 acres, including approximately 465 acres of new rights-of-way to be used for the overhead transmission corridor, 2,520 acres of existing rights-of-way to be leased from PSNH and used for the overhead transmission corridor, and approximately 176 acres for the underground transmission corridor.  The major components of the project include: a high-voltage direct current transmission line running from the Canadian border to a converter terminal in Franklin; a converter terminal

---

[1] Although the case docket identifies more than 100 intervenors, we list only those who filed a brief or a memorandum of law in the appellate proceedings.

to be constructed at South Main Street in Franklin; an alternating current overhead transmission line running from the converter terminal in Franklin to an existing substation in Deerfield; six high-voltage direct current overhead to underground transition stations to be located in Pittsfield, Clarksville, Stewartstown, Bethlehem, and Bridgewater; and "various access roads, laydown areas, staging areas and marshaling yards." The approximately 10-to-20 laydown areas would consist of open space areas ranging in size from five to 50 acres, located off the right-of-way along the length of the project.

According to the petitioners' application, approximately 60.5 miles of the transmission corridor would be located underground. For that portion of the HVTL using overhead transmission, the petitioners propose to use primarily lattice structures, with some tubular steel monopole structures. The lattice configuration would have an approximate base dimension of 30 feet by 30 feet and taper to a six foot by five foot column half way up the structure, anchored to four concrete foundations at the corners of the base approximately three to five feet in diameter. For the high-voltage direct current transmission portion of the project, the height of the structures would range from 60 to 135 feet. For the alternating current overhead transmission line portion of the project, the height of the structures would range from 48 to 160 feet.

The transmission line would cross existing substations in Northumberland, Whitefield, North Woodstock, Campton, Ashland, New Hampton, Franklin, Concord, and Deerfield. Overhead/underground transmission stations would be installed at each end of each underground segment of the line and occupy an area approximately 75 feet by 130 feet, enclosed with fencing. The Franklin converter terminal would include a variety of buildings occupying approximately 10 acres, enclosed with fencing. The Deerfield substation would be modified to include additional construction requiring the clearing of eight acres. Sixty-three miles of existing lines for the high-voltage direct current portion of the line, and 21 miles of existing lines for the alternating current portion of the line, would be relocated. These lines would remain within the boundaries of the existing right-of-way. A large number of structures associated with these existing lines would be replaced with structures greater in height than currently existing structures.

II.  Procedural Background

The petitioners filed their application with the Site Evaluation Committee in October 2015. Pursuant to RSA 162-H:9 (2014), the attorney general appointed a Counsel for the Public (CFP). In November, the chair of the Site Evaluation Committee appointed a Subcommittee. See RSA 162-H:4-a (Supp. 2016).[2] The Subcommittee sent notice to the municipalities affected by the

---

[2] Pursuant to RSA 162-H:4-a, I, the chairperson of the Site Evaluation Committee may establish a subcommittee "to consider and make decisions on applications, including the issuance of

4

project and included procedures for intervening in the proceedings.[3]  Following a public hearing, the Subcommittee accepted the application, finding that it "contained sufficient information to carry out the purposes of" RSA chapter 162-H.

In January 2016, the Subcommittee held public information sessions in Franklin, Londonderry, Laconia, Whitefield, and Lincoln.  See RSA 162-H:10, I-a (Supp. 2016) (amended 2017).  In addition, the Subcommittee held seven public hearings between March and June of 2016 in Meredith, Colebrook, Concord, Holderness, Deerfield, Whitefield, and Plymouth.  See RSA 162-H:10, I-c (Supp. 2016) (amended 2017, 2018).  The Subcommittee received 160 motions to intervene and, in May 2016, the Subcommittee combined the intervenors into groups by geography and areas of interest.  Between March 2016 and October 2017, the Subcommittee conducted seven days of site visits.

The Subcommittee held 70 days of adjudicative hearings between April and December 2017.  It received testimony from 154 witnesses and received 2,176 exhibits.  The evidentiary record closed on December 22, 2017.  The Subcommittee commenced its deliberations on January 30, 2018, first addressing whether the petitioners had "adequate financial, technical, and managerial capability to assure construction and operation of the facility in continuing compliance with the terms and conditions of the certificate."  RSA 162-H:16, IV(a) (Supp. 2016).  Although the Subcommittee did not take a formal vote, it "informally agreed" that the petitioners have "sufficient financial capability to ensure construction and operation of the Project."  The Subcommittee also agreed that the petitioners demonstrated that their "contractors and subcontractors have sufficient experience and resources required for construction of aboveground and underground transmission projects."  While the Subcommittee found that the petitioners "demonstrated that [they have] technical capacity to construct and operate the Project in compliance with the Certificate," it did not "come to a clear consensus in determining whether [the petitioners have] sufficient managerial capabilities to manage the planning and construction of this Project given its size and effects on surrounding communities."

The Subcommittee next deliberated on whether the "site and facility will not unduly interfere with the orderly development of the region with due

---

certificates."  The statute provides that "[f]or purposes of statutory interpretation and executing the regulatory functions of [RSA chapter 162-H], the subcommittee shall assume the role of and be considered the committee, with all of its associated powers and duties in order to execute the charge given it by the chairperson."  RSA 162-H:4-a, I.

[3] The affected municipalities are Pittsburg, Clarksville, Stewartstown, Dixville, Millsfield, Dummer, Stark, Northumberland, Lancaster, Whitefield, Dalton, Bethlehem, Sugar Hill, Franconia, Easton, Woodstock, Thornton, Campton, Plymouth, Ashland, Bridgewater, New Hampton, Bristol, Hill, Franklin, Northfield, Canterbury, Pembroke, Allenstown, Deerfield, Chester, Raymond, Londonderry, and Concord.

consideration having been given to the views of municipal and regional planning commissions and municipal governing bodies." RSA 162-H:16, IV(b) (Supp. 2018). The Subcommittee voted unanimously that the petitioners "failed to demonstrate by a preponderance of evidence that the Project will not unduly interfere with the orderly development of the region" and denied the application on February 1, 2018.

The petitioners filed a motion for rehearing and a request that the Subcommittee vacate its February 1 decision and resume deliberations. Following a hearing, the Subcommittee voted to suspend its oral decision made during deliberations, and to deny the application pending the issuance of a written decision. The Subcommittee issued a 287-page written decision denying the application on March 30, 2018. The petitioners then filed a second motion for rehearing. Following deliberations, the Subcommittee denied the motion in a 72-page written order, and this appeal followed.

III. Statutory Framework

A. Purpose

The siting of energy facilities and the Subcommittee's review of an application for a certificate is governed by RSA chapter 162-H. In the statute's declaration of purpose, the legislature "recognizes that the selection of sites for energy facilities may have significant impacts on and benefits to": (1) "the welfare of the population"; (2) "private property"; (3) "the location and growth of industry"; (4) "the overall economic growth of the state"; (5) "the environment of the state, historic sites, aesthetics, air and water quality"; (6) "the use of natural resources"; and (7) "public health and safety." RSA 162-H:1 (Supp. 2018). Accordingly, the legislature stated that

> it is in the public interest to maintain a balance among those potential significant impacts and benefits in decisions about the siting, construction, and operation of energy facilities in New Hampshire; that undue delay in the construction of new energy facilities be avoided; that full and timely consideration of environmental consequences be provided; that all entities planning to construct facilities in the state be required to provide full and complete disclosure to the public of such plans; and that the state ensure that the construction and operation of energy facilities is treated as a significant aspect of land-use planning in which all environmental, economic, and technical issues are resolved in an integrated fashion.

Id.

6

B.  Required Findings

In furtherance of these objectives, the legislature established a procedure "for the review, approval, monitoring, and enforcement of compliance in the planning, siting, construction, and operation of energy facilities." Id.  In order to issue a certificate, the Subcommittee is required to find:

(1) That the applicant has adequate financial, technical, and managerial capability to assure construction and operation of the facility in continuing compliance with the terms and conditions of the certificate.

(2) That the site and facility will not unduly interfere with the orderly development of the region with due consideration having been given to the views of municipal and regional planning commissions and municipal governing bodies.

(3) That the site and facility will not have an unreasonable adverse effect on aesthetics, historic sites, air and water quality, the natural environment, and public health and safety.

(4) That issuance of a certificate will serve the public interest.

RSA 162-H:16, IV(a)-(b), (c) (Supp. 2018), (e) (Supp. 2018).  In addition to the statutory requirements, the Subcommittee's review is governed by administrative rules adopted pursuant to RSA 162-H:10, VI (Supp. 2018).  See N.H. Admin. R., Site 100 et seq.  In issuing or denying a certificate, the Subcommittee "shall make a finding regarding the criteria stated in RSA 162-H:16, IV, and Site 301.13 through 301.17, and issue an order pursuant to RSA 541-A:35."  N.H. Admin. R., Site 202.28.  The Subcommittee has broad discretion in making a determination whether to issue a certificate and it may deny a certificate if it determines that the issuance of a certificate will not serve the "objectives" of RSA chapter 162-H after giving "due consideration" to all relevant information.  RSA 162-H:16, IV (Supp. 2018).

C.  Burden of Proof

For a certificate to issue, the burden of proof is on the applicant to make the necessary showings by a preponderance of the evidence.  See N.H. Admin. R., Site 202.19(b) (stating that "[a]n applicant for a certificate of site and facility shall bear the burden of proving facts sufficient for the committee . . . to make the findings required by RSA 162-H:16"); see also N.H. Admin. R., Site 202.19(a) (requiring that "[t]he party asserting a proposition shall bear the burden of proving the proposition by a preponderance of the evidence").

7

D.  Orderly Development of the Region

In determining whether a proposed energy facility will not unduly interfere with the orderly development of the region, the Subcommittee must consider: (a) "[t]he extent to which the siting, construction, and operation of the proposed facility will affect land use, employment, and the economy of the region"; (b) "[t]he provisions of, and financial assurances for, the proposed decommissioning plan for the proposed facility";[4] and (c) "[t]he views of municipal and regional planning commissions and municipal governing bodies regarding the proposed facility."  N.H. Admin. R., Site 301.15.

IV.  The Subcommittee's Decision

The Subcommittee voted unanimously to deny the application, concluding that after considering "the extent to which the siting, construction, and operation of the Project would affect land use, employment, and the economy of the region," the Subcommittee determined that the petitioners had "failed to demonstrate by a preponderance of evidence that the Project will not unduly interfere with the orderly development of the region."  In its written order, the Subcommittee detailed the parties' positions and the evidence submitted and set forth its deliberations on impacts of the project on orderly development including: (1) effects on land use during construction such as impacts on traffic, utilities, vegetation along the right-of-way, road surfaces, construction noise, the rights of private property owners, and access to private property during construction; (2) impact on employment in the region including establishment of the North Country Jobs Creation Fund — a $7.5 million fund to be spent on economic development and job creation in the region; (3) effects on the economy including wholesale electricity market savings, impacts on small businesses, effects on local real estate taxes, and establishment of the Forward New Hampshire Fund — to be funded with $10 million annually for 20 years to support community betterment, clean energy innovation, tourism, and economic development; (4) effect on real estate values; (5) effect on tourism; and (6) effect on current local land uses including forestry, agriculture, residential, commercial/industrial, transportation, institutional/government, recreation, and conservation, and historical and natural features such as rivers, wetlands and wildlife habitat.  The order also summarized the evidence of the views of municipal and regional planning commissions and municipal governing bodies on the effect of the project on implementing local, regional and state-wide plans.

A.  Construction Impacts

The Subcommittee concluded, among other things, that the "testimony and evidence demonstrated that construction of the Project would have an

---

[4] The Subcommittee determined that the project as proposed satisfied this criteria.

8

impact on traffic in affected communities and that the degree of the impact would vary," noting an "area of particular concern is the impact of the traffic on orderly development of Plymouth." The Subcommittee expressed concerns about construction impacts, such as "inadequate traffic management strategies, combined with a lack of communication and consideration of business access," and found that the petitioners did not meet their burden of proof on "whether the degree of traffic interference caused by construction would not unduly interfere with orderly development of the region."

In particular, the Subcommittee found that the petitioners did not provide a final survey of the right-of-way that was deemed acceptable by the New Hampshire Department of Transportation (DOT) and, therefore, neither the Subcommittee nor the petitioners could know the boundaries of the right-of-way or the precise location of each component of the underground section of the project, or determine the number and nature of exceptions to be filed with DOT. The Subcommittee concluded, however, that while not having this information was "problematic," it did not necessarily preclude the Subcommittee "from ascertaining the construction impacts on orderly development."

The Subcommittee found that the "impacts associated with construction under and over locally-maintained roads present[ed] a greater problem." It found that the petitioners did not clearly identify crossings over locally-maintained roads, the petitioners' evidence with respect to such roads did not include a traffic management plan, and that DOT had "raised significant concerns about usurping the authority of municipalities over locally-maintained roads." The Subcommittee explained that it

> needs to understand which roads and where the Applicant intends to cross. The Applicant failed to provide documentation that clearly identified crossings over locally-maintained roads and instead provided a list which did not differentiate between State and local roads. This oversight is consistent with the Applicant's failure to provide serious consideration and planning with respect to the impact of the Project on local roads, especially in the northern portion of the State.

In addition, the Subcommittee stated that it was unclear whether the two-year limit petitioners proposed would be sufficient to correct "surface distortions" caused by the project to locally-maintained roads.

B. Employment Impacts

The Subcommittee acknowledged that it is "undisputed that construction of the Project would generate a significant number of new jobs" and that although "most of these jobs would be temporary in nature, they would have a

9

positive effect on employment in the region during the construction period." However, the Subcommittee found that after construction the number of new jobs estimated by the petitioners' experts "is overinflated and does not reflect the actual number of jobs that would be created." The Subcommittee explained that "[a]fter construction direct jobs are estimated to be 2 per year, for employees working for Northern Pass" and that "[t]he remainder of jobs after construction is completed depends primarily on the amount of savings from the retail electricity market."

### C. Economic Impacts

The Subcommittee, noting that there is "no disagreement that the Project would generate energy savings," found that it would "have a small, but, positive impact on the economy." However, the Subcommittee found that that impact on the economy would be "much less significant" than predicted by the petitioners. In reaching this finding the Subcommittee made several determinations, including that: it "cannot conclude there will be savings from the Capacity Market"; "no actual greenhouse gas emission reductions would be realized if no new source of hydropower is introduced" and the "record is unclear as to whether the hydropower is new or will be diverted from another region"; the project "would likely have a positive effect because of the substantial real estate taxes it would pay to the affected communities"; as to the impact on local businesses, "neither the Forward New Hampshire Fund nor the Job Creation Fund had a transparent structure of governance and were not associated with any economic or government entity that would be accountable"; and the petitioners "failed to account for negative impact on businesses that could be caused by construction of the Project." Although the petitioners proposed to implement a "business loss compensation program," because the petitioners had not provided "an adequate assessment of the negative impacts of the Project" with respect to construction-period business impacts, the Subcommittee found "it is impossible for anyone to know what level of compensation or mitigation would be appropriate."

### D. Property Value Impacts

The petitioners' expert, James Chalmers, Ph.D., testified with respect to the "possible effects" of the project "on both property values and marketing times in local and regional real estate markets." Although he acknowledged that he is not an expert on the New Hampshire real estate market or property valuation in New Hampshire, he testified that the general literature and New Hampshire-specific studies support his opinion that "there is no evidence that HVTL[s] result in consistent measurable effects on property values, and, where there are effects, the effects are small and decrease rapidly with distance." Chalmers testified that "even though the presence of a HVTL corridor is generally perceived to be a negative attribute of a property, the weight attached to this particular attribute compared to all the other considerations that go into

10

market decisions is apparently too small to have any consistent measurable effect on the market value of real estate." He concluded that "there is no basis in the published literature or in the New Hampshire-specific research initiatives . . . to expect that the Project would have a discernible effect on property values or marketing times in local or regional real estate markets."

The CFP's experts, Thomas E. Kavet and Nicolas D. Rockler, Ph.D., of Kavet, Rockler & Associates, LLC (KRA), reviewed Chalmers' analysis and determined that his conclusion that the project will result in no measurable effects on the market value of residential real estate was not credible. According to KRA, Chalmers' review of existing literature was "selective and incomplete" and his review of the local market and case studies was "flawed and unreliable." KRA opined that

> [p]erhaps most importantly the Chalmers' analysis failed to examine the most important conduit for potential property valuation diminution in New Hampshire's area of high recreational and scenic amenity values – visual property degradation. And the Chalmers' analysis did not consider the impact on multi-family structures, such as the 148 townhouses in McKenna's Purchase in Concord, commercial properties such as the Sherburne Woods Senior Living facility in Deerfield, or the impact on hotels, motels, resorts, campgrounds, restaurants, etc. that rely on tourists.

KRA utilized "viewshed data . . . to estimate how much residential property may have a view of the transmission line and its structures and then . . . estimated the loss or gain in the value of that property using values from existing literature that were most relevant to the affected New Hampshire area." KRA then "transformed the value of a one-percent change in the assessed value of that property into a flow of income," and determined that "[e]very 1% decline in assessed property value potentially within the viewshed represents $11,628,154 in lost wealth by affected residential property owners." That, in turn, KRA determined is the "equivalent annual loss in imputed rent income of $202,671 for 2015."

Peter W. Powell, a realtor with over 40 years of experience "in all aspects of real estate sales and service" in northern New Hampshire, provided expert testimony on behalf of a group of intervenors who own property abutting the project in Dalton, Whitefield, and Bethlehem. Powell emphasized "the core values of view, location and the natural resources" that would be impacted by the project, noting that "[n]o study performed in any other location . . . can be used to fully explain or predict what may happen here" and that "[i]t is impossible to perform such a study here because to date, no HVTL comparable to that proposed by [the petitioners] exists here." Powell testified that because "[n]o comparable can be found in this marketplace [given that] no such line, with towers and the scope of the project, exists here today, . . . no evidence

11

exists to support a decision that the presence of [the project] would have no impact." Powell provided five specific examples to demonstrate "why the dynamics of North Country real estate sales make the findings presented to the Committee by [the petitioners' expert] to be misleading and contrary to experience on the ground here." Those examples supported his conclusion that the project already has negatively impacted the value of real estate in the region. In addition, Powell stated that, in his experience, "if indeed a property tainted by [the project] is able to be sold at all, the loss in value due to [the project] can range from 35 or 40 percent to as high as 75 percent, the higher range primarily for raw land."

The Subcommittee found Chalmers' "report and testimony to be insufficient to demonstrate that the Project will not have an unreasonably adverse impact on real estate values throughout the region." In reaching this finding, the Subcommittee made several determinations. First, the Subcommittee found that the literature reviews relied upon by Chalmers, indicating that HVTLs have little discernible impact on residential property values, were contradicted by his own studies that demonstrated an impact on residential property values ranging from a one percent to six percent reduction in sale price attributable to HVTLs, a negative price effect that could be as high as 20 percent to 25 percent on residential properties in rural residential subdivisions near HVTLs, and that "affected properties also suffered extended times on the market." Thus, the Subcommittee found that, "[i]n fact, the literature review . . . supports the intuitive position" that HVTLs have a negative impact on real estate values.

Second, the Subcommittee found that the case studies performed by Chalmers were not persuasive because they "were based on retrospective appraisals of properties in proximity to other existing HVTLs" that "were not similar to properties along the Project route" and had "substantial differences . . . especially with respect to the size of the proposed structures and the nature of the surrounding region." In addition, the Subcommittee found many of the conclusions reached by Chalmers to be unreliable. The Subcommittee also found that the subdivision study undertaken by Chalmers "suffered from similar data related problems" as did the case studies.

Third, the Subcommittee identified several "significant gaps" in the research Chalmers performed, including that he "gave little, if any, consideration to commercial property, condominiums, multi-family housing, vacant land, second homes or to property along the underground portion of the route." In addition, the Subcommittee rejected Chalmers' opinion that no property beyond 100 feet from the right-of-way would be impacted, finding that "[n]either the research supplied by" the petitioners, nor Chalmers' testimony, "reasonably supports that conclusion." The Subcommittee noted that there was a lack of evidence of how many properties outside of 100 feet from the right-of-way would experience a change in view if the project were constructed.

12

Accordingly, the Subcommittee concluded that the petitioners' "data and analyses are insufficient" for it "to determine how far the impacts on property values will reach," and that the petitioners did not meet their burden "in demonstrating that the Project's impact on property values will not unduly interfere with the orderly development of the region."

### E.  Tourism Impacts

The petitioners' expert, Mitch Nichols, opined that the project "will not affect regional travel demand and it will not have a measurable effect on New Hampshire's tourism industry."  Nichols noted that there is no quantitative research on the impacts of power lines on tourism.  Thus, to formulate a conclusion about the effects of the project on tourism, he reviewed relevant literature, examined data provided by Plymouth State University, conducted "listening sessions" with New Hampshire tourism industry participants, looked at labor statistics, and conducted an electronic prospective visitor survey.  Nichols submitted pre-filed testimony and a report, and testified for two days before the Subcommittee.  Regarding the listening sessions, Nichols noted that while some of the participants "expressed concern about future potential impacts of Northern Pass, no one provided any specific foundation or empirical support for the concern."  Nichols reviewed labor statistics "to gauge whether there is evidence of actual business expansion or contraction in the tourism industry from existing large electrical transmission lines," and found "no indication that the construction and operation of new transmission lines had any negative effect on the tourism industry."  Nichols acknowledged that he did not study or analyze the impacts of construction of the project on traffic closures and delays or on tourism in general.

The CFP's expert, KRA, reviewed Nichols' tourism impact analysis and concluded that it was not "a reasonable or credible assessment of the Project's potential impact on tourism."  According to KRA, the assessment was

> based on faulty logic, methodological errors in the analysis of
> tourism data, four listening sessions with limited participants
> some of whose views were unreported and largely ignored, an
> attempt to examine two "similar" transmission projects by the use
> of flawed methodology that renders the analysis meaningless, and
> a web-based survey of paid respondents that failed to ask a single
> question that mentioned, provided a visual simulation, or
> described a high voltage transmission line.

The Subcommittee did not find the report and testimony submitted by Nichols to be credible for several reasons.  The Subcommittee found that Nichols "did not exhibit familiarity with the New Hampshire tourism industry and tourism destinations in the North Country."  The Subcommittee noted testimony from the CFP's expert that Nichols did not study impacts on

13

individual tourism destinations or any specific region through which the project would pass, but instead addressed generally New Hampshire tourism without any reference to the specific characteristics of the project. The Subcommittee also found that the listening sessions conducted by and relied upon by Nichols were poorly designed, attended by only a limited number of people, and did not provide a variety of information and views on tourism and concerns about the project's impact. The Subcommittee noted that its "own experience in conducting information sessions, public hearings and site inspections along the proposed route demonstrated that there was a lot of public interest in the Project."

In addition, the Subcommittee found that the electronic surveys Nichols relied upon were "poorly worded," "misleading," failed to include "visitor intercept surveys," and "[f]ailed to obtain and address the views of a substantial number of varied stakeholders." By way of illustration, the Subcommittee described "but one" example of the misleading and poorly worded nature of the survey:

> [A] survey question asked "[h]ow often have you made your decision to visit the destination based primarily on each of the following factors?" One available answer to the question was "the destination has visible power lines in certain areas." No survey participants indicated that they made their decision to visit a destination because the destination had visible power lines. From these answers, Mr. Nichols concluded that powerlines have no impact on a tourist decision to visit New Hampshire . . . .

(Emphasis added.) The Subcommittee found that Nichols' conclusion that powerlines, therefore, have no impact on a tourist decision to visit New Hampshire is "illogical and does not readily follow from the question asked."

The Subcommittee found Nichols' comparison of the project to other existing HVTL projects flawed because those projects "are substantially different from" this project, "most notably because they were constructed fully within existing corridors, and the new structures remained below the tree canopy and were not plainly visible," whereas "[t]he structures designed for this Project are considerably taller and will be seen above the tree canopy in most of the region." In addition, the Subcommittee observed that those projects "are . . . located in areas that are substantially different from the Project's location." The Subcommittee noted that the CFP's experts opined that "there is ample evidence that scenic beauty and a pristine wilderness experience is a primary destination attribute affecting tourist visitation to New Hampshire." (Quotation omitted.) In addition, the Subcommittee found that Nichols "failed to address and analyze the impact that construction work over an extended period of time could have on tourism."

14

F.  Land Use Impacts and Municipal Views

The Subcommittee found that the petitioners "failed to demonstrate by a preponderance of evidence that proposed expansion of the right-of-way use would not interfere with the orderly development of the region."  The Subcommittee acknowledged the petitioners' expert's testimony that because the majority of the project would be constructed in an existing transmission right-of-way corridor, there would be no impact on the orderly development of the region and that construction of transmission lines in existing corridors is a sound planning principle.  The Subcommittee stated, however, that the expert "fails to note that it is not the only principle of sound planning nor is it a principle to be applied in every case."  Further, the Subcommittee noted that "the Project includes 32 miles of new aboveground right-of-way and 60 miles of underground installation in roads where there are no pre-existing transmission lines and certainly no existing corridor for transmission lines."

The Subcommittee found that the petitioners did not sufficiently address the impact that the underground portions of the project would have on existing land uses.  The Subcommittee stated that the petitioners "directed little, if any, attention to the effects that the underground portion of the Project may have on the surrounding land uses.  It is possible that there would be no negative effect, but the record contains little to assist us in making that determination."  In addition, with respect to the northernmost communities, the Subcommittee found that the petitioners "did not provide any testimony indicating that the Project would be consistent with residential, agricultural, and commercial uses in these areas" and have "not provided a satisfactory means and method to regulate the construction, maintenance and operation of the parts of the Project proposed to be constructed underneath municipal roadways."

After considering the evidence and the parties' positions, the Subcommittee found that the petitioners: (1) failed to demonstrate "that the Project would not overburden existing land uses within and surrounding the right-of-way and would not substantially change the impact of the right-of-way on surrounding properties and land use"; (2) did not sufficiently demonstrate "the effect the Project would have on the economy," including failing to provide "credible evidence regarding the negative impacts on tourism and real estate values" and failing "to provide a plan for construction of the Project that appropriately considered the Project's effects on municipal roads and business in the northern part of the State"; and (3) failed to "adequately anticipate and account for the almost uniform view" of municipal and regional planning commissions and municipal governing bodies of the affected municipalities "that the Project, as planned and presented, would unduly interfere with the orderly development of the region."

15

V. Issues on Appeal

The petitioners raise three main arguments on appeal. First, they assert that the Subcommittee violated RSA chapter 162-H by failing to: (1) consider all relevant information; (2) consider mitigating measures and conditions that could have reduced or eliminated project impacts; and (3) resolve the capacity market benefits or weigh the impacts and benefits of the project. Second, the petitioners argue that the Subcommittee's application of the burden of proof constituted improper ad hoc decision making. Third, they assert that the Subcommittee's finding that the project would unduly interfere with the orderly development of the region is arbitrary and unsupported.

VI. Standard of Review

Decisions by the Subcommittee are reviewed in accordance with RSA chapter 541. See RSA 162-H:11 (2014). We will not set aside the Subcommittee's order except for errors of law, unless we are persuaded, by a clear preponderance of the evidence, that the order is unjust or unreasonable. RSA 541:13 (2007). The Subcommittee's findings of fact are presumed prima facie lawful and reasonable. Id. In reviewing those findings, our task is not to determine whether we would have found differently or to reweigh the evidence, but, rather, to determine whether the findings are supported by competent evidence in the record. Appeal of Allen, 170 N.H. 754, 758 (2018). We review the Subcommittee's rulings on issues of law de novo. See id.

We defer to the Subcommittee's "judgment on such issues as resolving conflicts in the testimony, measuring the credibility of witnesses, and determining the weight to be given evidence." In the Matter of Aube & Aube, 158 N.H. 459, 465 (2009). The "trier of fact is in the best position to measure the persuasiveness and credibility of evidence and is not compelled to believe even uncontroverted evidence." DeLucca v. DeLucca, 152 N.H. 100, 102 (2005) (quotation omitted). As the trier of fact, the Subcommittee "resolve[s] conflicts in the evidence" and could "accept or reject such portions of the evidence presented as [it] found proper." Id. (quotation omitted). "It is not our task to determine whether we would have credited one expert over another, or to reweigh the evidence, but rather to determine whether the [Subcommittee's] findings are supported by competent evidence in the record." Appeal of Allen, 170 N.H. at 762. When faced with competing expert witnesses, "a trier of fact is free to accept or reject an expert's testimony, in whole or in part." Id. (quotation omitted).

On appeal, the burden is on the petitioners to show that the Subcommittee's order "is clearly unreasonable or unlawful." RSA 541:13.

16

VII. Analysis

A. Violations of RSA Chapter 162-H

The petitioners first argue that the Subcommittee "violated RSA 162-H by failing to consider all relevant information, including mitigating measures and conditions and by failing to weigh potential impacts and benefits." (Bolding and capitalization omitted.)

1. Consideration of all Relevant Information

The petitioners assert that the Subcommittee failed "to consider highly relevant information" on orderly development, thereby ignoring the legislature's mandate in RSA 162-H:1 that "all environmental, economic, and technical issues [be] resolved in an integrated fashion."[5] They argue that this failure is exemplified by the fact that, in considering the project's impact on land use, the Subcommittee focused on "aesthetics," despite it never having "deliberated on or decided aesthetic effects, or whether they were 'unreasonably adverse,' as required by RSA 162-H:16, IV(c)." The petitioners contend that if the Subcommittee "was going to improperly apply the aesthetic considerations of a separate statutory factor to the [orderly development] determination, it should have deliberated on aesthetics, and thus provided a framework for its consideration of aesthetics relative to" the orderly development of the region. They assert that the legislature "placed the consideration of aesthetics in the 'unreasonable adverse effect' section of RSA 162-H:16, IV(c), not under" orderly development, and, if the legislature had intended aesthetics to be incorporated into orderly development, "it would have said so." See RSA 162-H:16, IV(c) (requiring the Subcommittee to find that the site and facility "will not have an unreasonable adverse effect on aesthetics, historic sites, air and water quality, the natural environment, and public health and safety"); N.H. Admin. R., Site 301.05 (requiring that each application include a visual impact assessment of the proposed energy facility), Site 301.14 (setting forth the criteria relative to findings of unreasonable adverse effects on aesthetics, including visual impact on scenic resources).

The petitioners' argument, however, misconstrues the context of the Subcommittee's discussions of "aesthetics." Rather, in context, the Subcommittee discussed aesthetics as part of its consideration of the positions of the affected municipalities on the impact of the project on land uses in their communities — a consideration the Subcommittee must address in

---

[5] In their notice of appeal, the petitioners argued that it was error for the Committee to reach its decision without deliberating on each of the four criteria set forth in RSA 162-H:16, IV (Supp. 2018). However, the petitioners concede that they have waived the issue "of whether the Statute or Rules require consideration of all the RSA 162-H:16, IV criteria as a matter of law." Accordingly, we need not address it. See Sheehan v. N.H. Dep't of Resources & Economic Dev., 164 N.H. 365, 370 (2012).

17

determining whether the project will not unduly interfere with the orderly development of the region.  See N.H. Admin. R., Site 301.15(a).  The regulations require that each application for a certificate

> include information regarding the effects of the proposed energy facility on the orderly development of the region including the views of municipal and regional planning commissions and municipal governing bodies regarding the proposed facility, if such views have been expressed in writing, and master plans of the affected communities and zoning ordinances of the proposed facility host municipalities and unincorporated places, and the applicant's estimate of the effects of the construction and operation of the facility on . . . [l]and use in the region, including . . . (1) description of the prevailing land uses in the affected communities; and (2) description of how the proposed facility is consistent with such land uses and identification of how the proposed facility is inconsistent with such land uses.

N.H. Admin. R., Site 301.09(a).

The Subcommittee, in determining whether the project will not unduly interfere with the orderly development of the region, is required to consider the "views of municipal and regional planning commissions and municipal governing bodies."  RSA 162-H:16, IV(b).  In doing so in this case, the Subcommittee noted that the predominant position of local governing agencies "is quite clear" in that 30 of the 32 municipalities along the project's route have "expressed an opinion that the Project will interfere with the orderly development of the region" and part of that concern was how the aesthetics of the project would influence land uses in its vicinity.  Twenty-two of those communities "intervened in the process and presented evidence and cogent arguments" that the Subcommittee found to be "generally persuasive."

For example, the witness for the Bethlehem Board of Selectmen explained that the construction and operation of the project is inconsistent with the goal set forth in the town's Master Plan to "maintain the rural landscape," and "would affect the wetlands, natural environment, its rural character and tourism."  The witness for the Whitefield Board of Selectmen and Planning Board testified about inconsistencies between the project and the town's Master Plan, including the project's "negative effect on special land uses by affecting the views from Mountain View Grand Resort," and by adversely affecting the town's "rural character and attractiveness, tourism, and businesses that depend on tourism."  The witness for the Planning Board for the Town of New Hampton testified that the project would be inconsistent with the goal in the town's Master Plan to preserve the existing rural and small town character through "protection of the town's aesthetic values."  In addition, he testified that the project would violate sections of the town's Site Plan Review

18

Regulations because "[c]onstruction of the towers within an existing right-of-way would cause expansion of use by reducing screening from residential areas and expanding the scope and size of currently existing transmission infrastructure." The witness for the Town of Bristol testified that the project would unduly interfere with development of the region because it would be inconsistent with provisions in the town's Master Plan, including safeguarding "the rural quality of the Town, [and] building to create enduring value and beauty," and that the project would violate the town's Zoning Ordinance because it would "result in the widening of the current utility corridor/powerline clearcut, and would have a negative impact on the viewsheds and rural nature of the Town." (Quotation and brackets omitted.) The witness for the City of Concord testified that construction and operation of the project would be inconsistent with several land use sections of the city's Master Plan, including minimizing "undesirable impacts to adjacent land uses" and enhancing "the overall appearance and aesthetics of the community."

Taking into consideration the views of these and other municipal and regional planning commissions and municipal governing bodies, the Subcommittee disagreed with the petitioners' contention that their expert's research, "consisting of a review of local land uses, master plans and some zoning ordinances, supports a conclusion that the Project will not adversely affect land uses in the region." The Subcommittee determined that the expert "did little in the way of applying the details of the Project" to relevant master plans and zoning ordinances and "diminished the importance of master plans because they contain 'broad' visions and goals with respect to community aesthetics and efforts to preserve the rural landscape."

The Subcommittee reasoned that "master plans represent the considered views of the communities and should not be disregarded or minimized in importance," and it agreed with the municipalities in this case that, "given the magnitude of this Project, more consideration of the provisions of master plans and ordinances was required." As the Subcommittee noted, "The impact on aesthetics, agricultural uses, and the natural environment of the land directly relates to the ability of the parties to continue to use the land for its current purposes." Based upon the evidence before it, the Subcommittee concluded that "[g]iven the nature of the master plans and local ordinances along the Project's route, the Project would have a large and negative impact on land uses in many communities that make up the region affected by the Project." Thus, we disagree with the petitioners' assertion that the Subcommittee erroneously imported the aesthetic considerations from RSA 162-H:16, IV(c) into its consideration of orderly development of the region.

The petitioners also contend that the Subcommittee failed to consider the testimony of the CFP's expert on tourism and property values, and, had it done so, "it could have estimated the Project's impacts on tourism and property values in order to make the ultimate finding on" orderly development of the

19

region.  They assert that the Subcommittee was "obligated to consider" the CFP's expert testimony "that offered an estimate of property value and tourism impacts that would have been useful in assessing undue interference" with orderly development.  Contrary to the petitioners' position, the record shows that the Subcommittee did consider the expert's testimony as is reflected in its written order.  The Subcommittee, however, was not obligated to rely upon that testimony any more than it was obligated to rely upon the testimony of any other witness.  See Appeal of Allen, 170 N.H. at 762 (explaining that "a trier of fact is free to accept or reject an expert's testimony, in whole or in part" (quotation omitted)).

### 2.  Mitigation and Conditions

The petitioners next argue that the Subcommittee failed to consider mitigating measures and conditions that could have reduced or eliminated project impacts.  In doing so, the petitioners take issue with the Subcommittee's determination that it was not required to consider conditions when a certificate is denied.

The regulations provide that

> [i]n determining whether a certificate shall be issued for a proposed energy facility, the committee shall consider whether the following conditions should be included in the certificate in order to meet the objectives of RSA 162-H:
>
>  . . . .
>
> (i)  Any other conditions necessary to serve the objectives of RSA 162-H or to support findings made pursuant to RSA 162-H:16.

N.H. Admin. R., Site 301.17(i).  The Subcommittee stated that "Site 301.17(i) does not require [it] to consider conditions of a Certificate that is never issued," and it rejected the petitioners' interpretation that the regulation requires the Subcommittee "to draft . . . conditions that could cure the [petitioners'] failure to carry its burden of proof."  The Subcommittee reasoned that:

> Reading the rule to require [it] to consider conditions not offered by the Applicant in order to cure the Applicant's failure to carry its burden of proof would lead to an absurd result.  RSA 162-H:16, IV clearly and unambiguously states the findings the [Subcommittee] must make to issue a certificate and includes a finding that the Project will not unduly interfere with the orderly development of the region.  The statute specifically and unambiguously requires the [Subcommittee] to deny an application if a determination cannot be made that the Project will not unduly

20

interfere with the orderly development of the region.  To read the rule and statute as proposed by the Applicant would mean that the [Subcommittee] cannot deny a certificate after it finds that an applicant did not satisfy the requirements of RSA 162-H:16, IV and, instead, should proceed to considering conditions that would render a project certifiable under RSA 162-H:16.  Such a reading of the statute would render meaningless the criteria and the requirement to deny an application if such criteria are not satisfied.

(Citation omitted.)

The petitioners assert that this reasoning is flawed because "in permitting proceedings (like this one), mitigating measures and conditions are an integral part of the burden of proof, and cannot be divorced from it," and that the Subcommittee "posits a counter-intuitive paradigm where mitigation is considered only after an applicant first demonstrates that a project would not unduly interfere with [orderly development of the region], independent of mitigation."  According to the petitioners, "[i]f this were true, no energy project requiring mitigation could be built—and every project requires mitigation."

Because the Subcommittee found that the petitioners did not provide sufficient information for it to determine the extent of the project's impact on orderly development, it was not possible for the Subcommittee to impose conditions that might lessen those impacts.  As the Subcommittee stated, "without having information demonstrating the extent and nature of the Project's interference with orderly development of the region, it could not decide which conditions would address such interference."

Although the petitioners concede that "the ultimate decision of whether to impose specific mitigating measures as conditions rests with" the Subcommittee, they contend that "that does not mean that the [Subcommittee] was free to ignore measures the [petitioners] offered to reduce impacts, either as part of their burden of persuasion to estimate the Project's effects, or their ultimate burden" on the orderly development finding.  The record does not support the petitioners' argument that the Subcommittee ignored mitigation measures offered by them.  For example, the petitioners' expert on property values determined that approximately six or nine properties along the project's route might experience a drop in value as a result of the project.  As mitigation, the petitioners offered a "Guarantee Program" designed to ensure that owners of such properties "are not subject to an economic loss in the event of a sale of the property within 5 years after commencement of construction of the Project."  The Subcommittee stated that it "appreciat[ed] the attempt to mitigate the impact of the Project on property values."  However, the Subcommittee rejected the expert's assessment that only six or nine properties "of the thousands along the 192 mile route" would be affected by the project, concluding that the

21

petitioners' "data and analyses are insufficient for the [Subcommittee] to determine how far the impacts on property values will reach." Thus, the Subcommittee determined that because the petitioners' "analysis of the effects [of the project on property values] was . . . inadequate, it was impossible for [the Subcommittee] to even begin to consider what an appropriate compensation plan might require."

To the extent the petitioners imply that the Subcommittee itself is required to craft mitigation measures, we reject this position. The petitioners "bear the burden of proving facts sufficient for the [Subcommittee] to make the findings required by RSA 162-H:16." N.H. Admin. R., Site 202.19(b); see N.H. Admin. R., Site 202.19(a). Mitigation measures proposed by an applicant in order to satisfy its burden of proof are part of the "facts sufficient" for the Subcommittee to make the required statutory findings under RSA 162-H:16, IV. To require the Subcommittee to craft its own mitigating measures in order to make up for an applicant's failure to satisfy the statutory and regulatory criteria would shift the burden of proof to the Subcommittee, in contravention of the plain language of the regulations.

### 3. Weighing the Benefits and Impacts of the Project

Next, the petitioners assert that the Subcommittee "failed to decide the extent of capacity market benefits and how they would affect the region's economy," that the Subcommittee's "job was to weigh the expert evidence and make a decision on this issue," and that its failure to do so is "inexplicable and wrong." The petitioners argue that "the record demonstrated approximately $1.5 billion in benefits" — benefits that the petitioners contend will accrue regardless of any capacity market savings — because "[t]hey include direct expenditures on taxes and the [Forward New Hampshire Fund], as well as [Gross State Product], from those and other expenditures and construction jobs." According to the petitioners, "[h]ad the [Subcommittee] weighed the undisputed Project benefits against potential property value and tourism impacts, it could have readily found the Project would not unduly interfere with" orderly development of the region.

We disagree with the petitioners' assertion that the Subcommittee failed to weigh the evidence and make a determination on the capacity market benefits. The Subcommittee acknowledged that the project "would have a somewhat positive effect" on the economy. However, it explained that

> [t]he impact on the economy and employment during operations of the Project is largely dependent on savings from the wholesale electricity market. The Applicant has not demonstrated that savings from the Capacity Market will occur; or if they do occur, that they will be as large as the Applicant's expert said they would be. While benefits to the economy and employment would be

22

positive, we cannot find they would be as large as the Applicant predicts. The uncertainty regarding Market Capacity savings affects other parts of the economic analysis, because those savings are the basis for the Applicant's projections about employment and other economic activity along the route of the Project and elsewhere in the State and the rest of New England.

(Emphases added.)

Moreover, even assuming, without deciding, that the $1.5 billion in benefits was "undisputed," the record demonstrates that the Subcommittee was unable to weigh those purported benefits against property value and tourism impacts. The Subcommittee explained that these parts of the economic analysis had "more profound problems" than uncertainty regarding savings from the capacity market. The Subcommittee reiterated that it did not find the petitioners' expert regarding the effects of the project on tourism to be credible and that "[h]is report and testimony provided [the Subcommittee] with no way to evaluate the Project's tourism effects and no way to fashion conditions that might mitigate those effects." Similarly, regarding property values, the Subcommittee "did not find credible the Applicant's expert's opinion that there would be no discernible effect on property value."

### B. Improper Ad Hoc Decision Making

Next, the petitioners argue that the Subcommittee's "flawed application of the burden of proof was improper ad hoc decision making." (Bolding and capitalization omitted.)[6] They contend that the Subcommittee measured the burden of proof "by wholly arbitrary standards that the [petitioners] could not predict or meet." In support, they assert that the Subcommittee's application of the orderly development standard was "both unlawful and unreasonable under RSA 541:6, and unconstitutional" because: (1) the Subcommittee left key terms undefined and the regulations on orderly development provide "no guidance" as to the information that will be considered when determining whether the petitioners' burden of proof has been satisfied; (2) the Subcommittee ignored its own precedent that construction in an existing right-of-way is consistent with existing land uses; and (3) the Subcommittee erroneously imposed a new "affirmative burden" on the petitioners to address and resolve the views of municipal and regional planning commissions and municipal governing bodies.

---

[6] To the extent that the petitioners imply that the Subcommittee's decision was based upon personal feelings of the individual members rather than objective and discernible facts, we reject this implication. In this case, the record facts support the Subcommittee's decision. Cf. Trustees of Dartmouth Coll. v. Town of Hanover, 171 N.H. 497, 512-13 (2018) (deciding that administrative board "unreasonably relied upon personal feelings and ad hoc decision-making").

23

## 1. Statutory Terms and Regulatory Standards

The petitioners assert that the "vague Statute and Rules were applied in such an arbitrary manner as to violate [their] right to due process under the New Hampshire Constitution Part 1, Articles 12 and 15." They contend that the Subcommittee left "key terms" such as "region" undefined, and that the regulations "provide no guidance as to the information that will be considered when determining whether the [petitioners] satisfied their burden of proof." (Quotation and brackets omitted.) To the extent the petitioners are arguing that the statute and regulations are unconstitutionally vague, this argument is insufficiently developed for appellate review. See Keenan v. Fearon, 130 N.H. 494, 499 (1988). To the extent that they are asserting that the statute and regulations lack guidance and were, therefore, applied arbitrarily, we address this argument.

The regulations identify the documents and information an applicant is required to provide in order to address the effect of the project on the orderly development of the region:

(a) Land use in the region, including the following:

(1) A description of the prevailing land uses in the affected communities; and

(2) A description of how the proposed facility is consistent with such land uses and identification of how the proposed facility is inconsistent with such land uses;

(b) The economy of the region, including an assessment of:

(1) The economic effect of the facility on the affected communities;

(2) The economic effect of the proposed facility on in-state economic activity during construction and operation periods;

(3) The effect of the proposed facility on State tax revenues and the tax revenues of the host and regional communities;

(4) The effect of the proposed facility on real estate values in the affected communities;

(5) The effect of the proposed facility on tourism and recreation; and

24

(6) The effect of the proposed facility on community services and infrastructure;

(c) Employment in the region, including an assessment of:

(1) The number and types of full-time equivalent local jobs expected to be created, preserved, or otherwise affected by the construction of the proposed facility, including direct construction employment and indirect employment induced by facility-related wages and expenditures; and

(2) The number and types of full-time equivalent jobs expected to be created, preserved, or otherwise affected by the operation of the proposed facility, including direct employment by the applicant and indirect employment induced by facility-related wages and expenditures.

N.H. Admin. R., Site 301.09.

We agree with the Subcommittee that "[t]he statute and the rules provided the [petitioners] with a reasonable opportunity to know not only the standard to be considered, but also the information that would be considered when deciding whether the [petitioners] satisfied [their] burden of proof." The Subcommittee explained:

The statute and the rules put the [petitioners] (like any other reasonable party) on notice that: (i) the Subcommittee could issue the Certificate only if the [petitioners] established that the Project would not unduly interfere with the orderly development of the region; (ii) when determining whether the Project would unduly interfere with the orderly development of the region, the Subcommittee would consider the effects of the Project on land use, employment, and the economy of the region; (iii) when determining the Project's impact on land use, the Subcommittee would consider the assessment that the [petitioners] filed pursuant to Site 301.09(a); (iv) when determining the Project's impact on employment, the Subcommittee would consider the assessment that the [petitioners] filed pursuant to Site 301.09(c); and (v) when determining the Project's impact on the economy, the Subcommittee would consider the reports addressing the Project's impact on the economy, taxes, property values, and tourism filed by the [petitioners] pursuant to Site 301.09(b).

As the Subcommittee reasoned, it was "not necessary to specifically define 'undue,' 'interference,' and 'region'" because "(i) the statutory scheme provides . . . notice as to what will be considered by the Subcommittee; and (ii) such a

decision is based on the facts supported by the record.  The words in the statute are all understood to have a common meaning."  We agree with the Subcommittee that

> RSA 162-H:16, IV, Site 301.09, and Site 301.15, provided the [petitioners] with . . . reasonable notice of the information that would be considered while deciding whether the Project would unduly interfere with the orderly development of the region.  The record and the Decision clearly identify the facts the Subcommittee relied on when determining that the [petitioners] failed to carry [their] burden of proof and failed to demonstrate facts sufficient for the Subcommittee to find that the Project would not unduly interfere with the orderly development of the region.  The Subcommittee members specifically addressed the testimony and reports filed by the [petitioners'] experts, identified gaps and inaccuracies in the reports, identified the reasons why the testimony and reports were inadequate and not credible, and specifically stated why they could not be relied upon.

The Subcommittee based its denial of the petitioners' application "on the record," and rejected the petitioners' characterization that it denied the project "on an ad hoc basis based on some vague, unarticulated concerns."

The record supports this characterization as it shows that the Subcommittee reviewed the report filed by the petitioners pursuant to Site 301.09(a) and considered the petitioners' expert's testimony concerning the effects of the project on land use in the region.  The Subcommittee found that the report and the expert's testimony "were not credible and could not be relied upon in ascertaining the impact of the Project on land use."  The Subcommittee reviewed the reports and testimony provided by the petitioners pursuant to Site 301.09(b) regarding the effects of the project on the economy of the region and found they "were not credible" and, therefore, it "could not rely on them to ascertain the impact of the Project on real estate values and tourism."  The Subcommittee reviewed the reports and testimony submitted by the petitioners pursuant to Site 301.09(b) and (c), addressing the impacts of the project on the economy and employment, and found that the petitioners' "assessment . . . failed to account for the negative impacts on local business and employment" and that "[w]ithout having the information about the extent of the negative impacts of the Project, the Subcommittee determined that it could not truly ascertain the extent of the impacts."  The Subcommittee was "in the best position to measure the persuasiveness and credibility of evidence and [was] not compelled to believe even uncontroverted evidence."  DeLucca, 152 N.H. at 102 (quotation omitted).  We have reviewed the record and determine that the Subcommittee's findings could reasonably be made based on the evidence presented.  See Appeal of Allen, 170 N.H. at 762.  Accordingly, we reject the

26

petitioners' assertion that the statute and regulations lack sufficient guidance or were applied in an arbitrary manner.

The petitioners also argue that the regulations only require them "to provide 'estimates' of the effects in each area for the [Subcommittee] to use in deciding whether those effects, taken together, amounted to undue interference with" orderly development of the region. Accordingly, they contend that the Subcommittee's order "mistakenly hinged on [its] finding" that the petitioners "had to meet a burden of proof on each subsection of Site 301.09, and then required a showing of the 'type and extent of impacts' and the 'extent and nature of such interference' for each one of those subsections."

The Subcommittee rejected this argument, stating that it "did not" require the petitioners "to prove that there would be no impact or a positive impact on land use, the economy, employment, tourism, and property values." Rather, the Subcommittee "specifically and clearly concluded" that the petitioners failed to carry their burden of proof — not because the evidence demonstrated no impact or did not demonstrate a benefit — but because they "failed to provide sufficient credible evidence that would allow the Subcommittee to determine the impact and the extent of the impact of the Project on the components of the orderly development of the region – land use, property values, tourism, local economy, and employment."

For example, in considering the impact of the project on existing land use, the Subcommittee received "substantial testimony and evidence" indicating that, "due to its size and scope," the project would "intensify and overburden the right-of-way to the extent that it would render it inconsistent with the existing land uses in the region." The Subcommittee, however, did not find that the project would have a negative impact on land use because it would overburden the use of the right-of-way. Rather, because the petitioners had proceeded "on the sole premise that the Project would not impact land use so long as it is located within the existing right-of-way," the Subcommittee determined that the petitioners "failed to provide sufficient credible evidence" for the Subcommittee to analyze the impact of the project on land use.

Similarly, in considering the impact of the project on tourism, the Subcommittee found that the petitioners' expert's "work in this area provided an inadequate basis upon which to form an opinion." Likewise, in considering the impact of the project on the economy, the Subcommittee found that the petitioners "failed to provide credible information that would demonstrate the effect or the absence of effect" and that "[w]ithout this information," the Subcommittee "could not ascertain the effect of the Project on the economy and, consequently could not determine the extent of the Project's interference with the orderly development of the region, if any."

Although the petitioners assert that the Subcommittee applied the burden of proof "using criteria that appear nowhere in the Statute or Rules," and did not explain "what it required to meet that burden," our review of the record shows that the Subcommittee made detailed findings regarding the credibility of the witnesses and the sufficiency of the evidence, consistent with the criteria the petitioners had notice they were required to meet.

### 2. Right-of-Way

The petitioners argue that because the Site Evaluation Committee has previously found that the "single most important fact bearing on" orderly development was "that the proposed line is constructed in an existing, occupied utility corridor," its prior decisions "provide an administrative gloss" on the Subcommittee's land use rule. Thus, the petitioners assert that the Subcommittee acted arbitrarily in this case by determining that that principle is "not . . . to be applied in every case." We disagree.

"The doctrine of administrative gloss is a rule of statutory construction. Administrative gloss is placed upon an ambiguous clause when those responsible for its implementation interpret the clause in a consistent manner and apply it to similarly situated applicants over a period of years without legislative interference." Petition of Kalar, 162 N.H. 314, 321 (2011) (citation and quotation omitted). "Lack of ambiguity in a statute . . . , however, precludes application of the administrative gloss doctrine." Id. at 322. Here, the petitioners do not argue that either the statute or the regulations regarding the effect of the project on land use in the region are ambiguous and we determine, therefore, that the doctrine is not applicable. Furthermore, the statute expressly provides that the Subcommittee "shall consider, as appropriate, prior committee findings and rulings on the same or similar subject matters, but shall not be bound thereby." RSA 162-H:10, III.

The petitioners also argue that the Subcommittee failed to make findings of fact or explain why "this" HVTL "actually impacts prevailing land uses in a manner that would justify jettisoning precedent." We disagree with this characterization of the record. The petitioners' expert testified that the project would be consistent with prevailing land uses because it would be constructed mostly within the existing right-of-way. The Subcommittee reasoned, however, that requiring it to find that the project "would be consistent with prevailing use solely because it would be constructed within the existing right-of-way without analyzing the characteristics of the Project and its actual consistency with the prevailing land uses would render the requirement to assess the impact of each project on land uses meaningless."

The Subcommittee explained why the principle did not apply to the project in this case:

28

Over-development of an existing transmission corridor can impact land uses in the area of the corridor and unduly interfere with the orderly development of the region. Increases in the use of a transmission corridor require increased maintenance requirements, increased access requirements, and increased readiness of emergency response personnel. Access to transmission corridors is ultimately obtained from publicly maintained roads and thoroughfares. Unsightly transmission corridors or infrastructure within corridors can impact real estate development in the surrounding area. Increased maintenance, repair and emergency operations require the use of heavy machinery and trucks placing the continued use of lands for agricultural purposes at risk. A highly developed corridor may discourage use of the corridor and surrounding lands for recreational purposes.

The Subcommittee rejected the petitioners' characterization that it had "created a new, vague standard," reiterating that, to the contrary, it found that the petitioners "failed to consider the land use impact, relied on a mistaken premise that as long as the Project is constructed within an existing right-of-way it will be consistent with prevailing land uses, regardless of its characteristics and nature of the land uses, and failed to analyze the actual consistency or inconsistency with land uses in the region." The Subcommittee concluded that the project's consistency with land uses in the region could not be determined because the petitioners failed to "actually address the impacts," instead relying solely upon the rationale that the project "would be built within the existing corridor." As the Subcommittee stated, "with the benefit of seven site visits, [it] determined that there are various places along the route where there could be significant impact. The Subcommittee might find that the project was or was not consistent with existing land uses at these locations, if the [petitioners] had actually addressed the impacts." Contrary to the petitioners' assertion that the Subcommittee "made no findings of fact" explaining why, in this case, construction in an existing right-of-way would unduly interfere with orderly development of the region, the Subcommittee did not determine that construction in the right-of-way would overburden the existing corridor. Rather, given the petitioners' steadfast position that there could never be an adverse effect on local land use, the Subcommittee determined that there was insufficient credible evidence before it to resolve the issue of impact on orderly development.

### 3. Views of Municipalities

The petitioners next contend that, "for the first time," the Subcommittee "imposed an affirmative burden" on them to "address and resolve" the views or concerns of municipal and regional planning commissions and municipal governing bodies. The record does not support this contention.

The Subcommittee found that the petitioners' assertion that the project is consistent with local, regional, and statewide long-range plans "is directly contradicted by the testimony of municipal officials" and it agreed with the municipalities that "given the magnitude of the Project, more consideration of the provisions of master plans and ordinances was required." The Subcommittee expressed "concern" that the petitioners' representatives "would take time to meet with local planning agencies and not solicit their views of the Project." Taking into consideration all the relevant information, the Subcommittee found the testimony provided by the municipalities on the impacts of the project on them to be persuasive and, in the absence of evidence from the petitioners that the concerns raised by the municipalities were incorrect, the Subcommittee aptly found that the petitioners "failed to demonstrate by a preponderance of the evidence that the Project would not unduly interfere with the orderly development of the region."

## C. Finding on Orderly Development

Finally, the petitioners assert that the Subcommittee's "sole finding that the project would unduly interfere with [orderly development of the region] is arbitrary and unsupported." (Bolding and capitalization omitted.) According to the petitioners, the "sole instance" where the Subcommittee "actually found undue interference" involved the short-term effects of "construction under approximately four miles of roads" and that finding "alone demonstrates the wholly arbitrary nature" of the Subcommittee's order. As set forth above, however, the Subcommittee did not deny the petitioners' application for a certificate because it found that the proposed project would unduly interfere with the orderly development of the region based in whole or in part on one evident short-term impact. Rather, the Subcommittee considered the competing evidence on each of the orderly development criteria and found that the quality of the petitioners' evidence was insufficient for the Subcommittee to reach a determination on the project's impact on the orderly development of the region.

## VIII. Conclusion

"The legislature has delegated broad authority to the Committee to consider the 'potential significant impacts and benefits of a project,' and to make findings on various objectives before ultimately determining whether to grant an application." Appeal of Allen, 170 N.H. at 762 (quoting RSA 162-H:16, IV). In this case, the Subcommittee considered and weighed extensive evidence including testimony from 154 witnesses and over 2,000 exhibits presented by the parties, including 160 intervenors, conducted seven site visits, and held 70 days of adjudicative hearings.

Our review is limited to determining whether the Subcommittee's findings are supported by competent evidence in the record and are not

erroneous as a matter of law. In doing so, we defer to the Subcommittee's resolution of conflicts in the testimony and its determination of the credibility of witnesses and the weight to be given evidence. We reiterate that it is not our task to reweigh the evidence or to determine whether we would have credited one expert over another.

We have reviewed the record and conclude that the Subcommittee's findings are supported by competent evidence and are not erroneous as a matter of law. Accordingly, we hold that the petitioners have not sustained their burden on appeal to show that the Subcommittee's order was unreasonable or unlawful. See RSA 541:3.

Affirmed.

LYNN, C.J., and HICKS, BASSETT, and DONOVAN, JJ., concurred.